UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

JAMES HUNTER,

                          Plaintiff,

             v.

CITY OF NEW YORK, OFFICER GIUCA,
SHIELD # 9511 and DETECTIVE KING, SHIELD
# 4607,

                       Defendants.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-6139 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff James Hunter, proceeding *pro se*, commenced this action on or about December 12, 2012 against Defendants City of New York, Officer Giuca, Shield # 9511 and Detective King, Shield # 4607, alleging deprivation of due process, breach of oath of office, deprivation of equal protection of the law and abuse of authority by individual Defendants Giuca and King and a claim of municipal liability against the City of New York, pursuant to 42 U.S.C. § 1983. (Compl. 1–2.) Defendants moved for a more definite statement of the Complaint pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, (Docket Entry No. 11), and Plaintiff filed a more definite statement on April 26, 2013, with additional factual allegations, (Docket Entry No. 21). Defendants now move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Oral argument was held on August 1, 2014. For the reasons set forth below, Defendants' motion for judgment on the pleadings is granted in part and denied in part.

## I. Background

According to Plaintiff's Complaint, as amended by the more definite statement, on April 25, 2011, an Rodwell Jones, a non-party, struck Plaintiff with a metal pole,[1] causing him to suffer a fractured rib.[2] (Pl. Response to Order for More Definite Statement, Docket Entry No. 21 ("Statement") ¶ 1.) Plaintiff had a telephone conversation with "Captain Taylor," who informed him that Taylor observed a surveillance video of the incident and saw Plaintiff defending himself following the assault. (*Id.* ¶ 2.) Plaintiff surrendered to Taylor and Giuca on the same day, informing them that he had been assaulted by Jones and had sustained injuries to his left elbow and left ribs. (*Id.* ¶ 3.) Plaintiff provided Taylor and Giuca with the metal pole Jones used to assault Plaintiff. (*Id.*) Plaintiff requested medical attention and was told that he would obtain emergency medical services ("EMS") after being processed at the 70th precinct. (*Id.*) During the arrest process,[3] King stated that she knew the family of Rodwell Jones, Plaintiff's alleged assailant.[4] (*Id.*) At the precinct, Plaintiff "informed [King and Giuca] of [his] sustained injuries and pain," and "requested to go to the hospital," and to make an assault complaint against Jones,

---

[1] Plaintiff refers to a metal "pole" and a metal "pipe" interchangeably throughout his pleadings and briefing.

[2] The Court accepts the factual allegations in the Complaint, as amended by the more definite statement, as true for purposes of this motion. *See Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013); *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012); *Prince v. Entergy Nuclear Operations, Inc.*, No. 11-CV-74, 2011 WL 3363207, at *1 (D. Vt. Aug. 3, 2011) (drawing facts from the plaintiff's "Amended Complaint and 'more definite statement of facts,'" and assuming them to be true for purposes of the defendant's motion to dismiss).

[3] According to the complaint room screening sheet, Plaintiff was arrested after Jones struck Plaintiff with a metal pipe and Plaintiff stabbed Jones. ("Complaint Room Screening Sheet," annexed to Statement at ECF 3.)

[4] At oral argument, Plaintiff clarified that King stated that she knew a business associate of Jones.

but "was not allowed." (*Id*. ¶ 4.) Giuca informed Plaintiff that if he were to go to the hospital, he would "make sure it took much longer for [Plaintiff] to get to court." (*Id*.) Giuca took several photographs of Plaintiff's injuries, and "did not memorialize as required by NYPD procedures the particulates [*sic*] of the investigation." (*Id*. ¶¶ 5–6.) Plaintiff appends several documents to the Statement including: a complaint room screening sheet dated April 25, 2011 ("Complaint Room Screening Sheet," annexed to Statement at ECF 3), medical records from New York City Correctional Health Services dated April 30, 2011, and May 1, 2011, ("NYC Correctional Health Services report dated April 30, 2011," annexed to Statement at ECF 4; "NYC Correctional Health Services report dated May 1, 2011," annexed to Statement at ECF 5), several pages of transcript labeled "Suppression," ("Suppression Hearing Tr.," annexed to Statement at ECF 6–9), and an undated newspaper article about lawsuits brought against the NYPD by diabetic pre-trial detainees denied their insulin during the arrest process, ("New York Daily News Article," annexed to Statement at ECF 10).

## II. Discussion

### a. Standard of Review

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters*., 448 F.3d 518, 520 (2d Cir. 2006); *see also Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). In reviewing a Rule 12(c) motion for judgment on the pleadings, the Court must "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden*, 594 F.3d at 160 (alteration, citation and internal quotation marks omitted). A

claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (discussing Rule 12(b)(6) (quoting *Iqbal*, 556 U.S. at 678)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). However, the court need not accord "a legal conclusion couched as a factual allegation" the same presumption of truthfulness. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). In reviewing a *pro se* complaint, the court must be mindful that the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, the court "remain[s] obligated to construe a *pro se* complaint liberally"). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint. *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"[5] *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

---

[5]  When deciding a motion for judgment on the pleadings, a court's review is limited to the four corners of the complaint but a court may also review: (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (documents attached to the complaint, material incorporated by reference and documents integral to the complaint) (Rule 12(c)); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records) (Rule 12(b)(6)). If the court takes judicial notice of public records, it does so "in order to determine what statements

### b. Deprivation of Due Process

Plaintiff's claim of deprivation of due process against Giuca and King is not entirely clear as set forth in the Complaint or Statement, but in his memorandum in opposition to Defendants' motion for judgment on the pleadings, Plaintiff discusses the failure by the arresting officers to properly memorialize details of the investigation, the failure to provide prosecutors with their memo books containing notes from the arrest, and the failure to timely provide prosecutors with the surveillance tape of the incident, as a result of which delay the tape was damaged and a backup copy could not be found in time for trial.[6] (Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings, ("Pl. Opp'n Mem.") 11–14.)[7] In support of his allegations Plaintiff relies on an excerpt of what he describes as the trial transcript in which the state prosecutor conceded that "NYPD messed up, Officer Giuca messed up. In all probability a lot of people messed up." (*Id*. at 14.) Justice Danny K. Chun of the New York Supreme Court, Kings County, commented, in what appears to be a reference to the destroyed surveillance videotape of the incident, that Giuca "should have followed up upon not being able to open it, he should have been more diligent in trying to obtain another copy . . . . He let it sit until it was time to hand it over to the district attorney, many months later." (*Id*. at 15.) However, Justice Chun declined to give the jury an adverse inference instruction against the

---

they contained[,] but not for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (alteration, citation and internal quotation marks omitted) (Rule 12(b)(6)).

[6] At a pre-motion conference on September 26, 2013, Plaintiff clarified that his due process claim was based on (1) the failure of the Defendants to properly memorialize the details of the investigation, and (2) the failure to timely provide prosecutors with the surveillance tape.

[7] Plaintiff's opposition papers include two Memoranda of Law. For ease of reference, the Court refers to these documents as a single Memorandum of Law, and refers to the Electronic Case Filing (ECF) page numbers.

state.  (*Id.*)  Defendants argue that because these alleged violations occurred during the course of the prosecution of Plaintiff's criminal case, Plaintiff is "directly challenging the legitimacy of his criminal conviction," and his conviction for assault in the first degree on September 12, 2012 bars him from raising a claim of due process violations to challenge his prosecution.  (Defendant's Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Def. Mem." ) 5.)  Defendants are correct.

Plaintiff cites *California v. Trombetta*, 467 U.S. 479, 480 (1984), which recognized that "[t]he Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment."  (*See* Pl. Opp'n Mem. 11.)  In *Trombetta*, the Supreme Court addressed several habeas corpus petitions brought by incarcerated individuals seeking to invalidate their convictions on the grounds that the convictions were obtained as a result of allegedly unconstitutional failures by the State to preserve potentially exculpatory evidence.  *See Trombetta*, 467 U.S. at 483.  Here, unlike the cases addressed in *Trombetta*, Plaintiff is not bringing a habeas corpus challenge to his conviction.  Because Plaintiff was convicted, his only recourse to challenge his conviction is through direct appeal, post-conviction review or a petition for habeas corpus.  *See Wallace v. Kato*, 549 U.S. 384, 392 (2007) ("Congress . . . has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." (citation and internal quotation marks omitted)); *Hayden v. Pataki*, 449 F.3d 305, 341 (2d Cir. 2006) ("The law recognizes habeas corpus as 'the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release.'" (quoting *Heck v. Humphrey*, 512 U.S. 477, 481 (1994))).

To the extent that Plaintiff asserts that his constitutional rights were violated by the arresting officers' failure to hand over the surveillance tape to the district attorney in a timely fashion, contributing to his inability to present the tape as exculpatory evidence during trial, and by the officers' failure to keep proper notes or provide the prosecution with his memo books — claims that the Court does not opine on — Plaintiff is challenging the constitutionality and therefore the lawfulness of his conviction.[8]  As a result, unless Plaintiff can show that his conviction has been reversed, declared invalid, or called into question by the issuance of a writ of habeas corpus, Plaintiff cannot assert a § 1983 claim against Giuca or King.  *See Heck*, 512 U.S. 477, 486–87 (1994) (holding that "in order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus").  Plaintiff's claim of due process violations against all Defendants is dismissed.

### c.   Denial of Medical Attention

Plaintiff claims that the individual Defendants' refusal to permit him to seek medical attention during the arrest process is an Eight Amendment violation.  (Pl. Opp'n Mem. 2–4.)  However, because Plaintiff was a pre-trial detainee at the time of the alleged violation, the source of his constitutional rights for a claim of deliberate indifference to serious medical need is the

---

[8]  Plaintiff's reliance on *People v. Perez*, further underscores the fact that he is challenging his conviction.  (*See* Pl. Opp'n Mem. 11.)  In *Perez*, the New York Court of Appeals held that a prosecutor's failure to timely turn over pretrial statements of trial witnesses so that "defense counsel . . .  can meaningfully assist in the preparation of the cross-examination," required a reversal of the petitioner's criminal conviction.  *See People v. Perez*, 65 N.Y.2d 154, 159 (1985).

Due Process Clause rather than the Eight Amendment. *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under . . . the Due Process Clause of the Fourteenth Amendment if held in state custody."); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("Because as a pre-trial detainee she was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply. . . . [Plaintiff's] claims arise under the Due Process Clause . . . instead."). Nevertheless, regardless of whether Plaintiff's claim is an Eight Amendment or Due Process claim, the applicable standard is the same. *See Caiozzo*, 581 F.3d at 69 ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (same); *Liggins v. Griffo*, 356 F. App'x 537, 539 (2d Cir. 2009) (same).

To establish a claim of deliberate indifference to a serious medical condition, a plaintiff must satisfy both an objective and a subjective element. The plaintiff must show (1) that he had an objectively "serious medical condition," and (2) that this condition was met with subjective "deliberate indifference" on the part of the defendants. *Caiozzo*, 581 F.3d at 72 (quoting *Cuoco*, 222 F.3d at 106). Defendants argue that Plaintiff did not suffer from an objectively serious medical condition, and that even if he had, Plaintiff cannot show that Defendants' conduct rose to the level of deliberate indifference. (Def. Mem. 8–10.)

### i.  Serious medical condition

To establish a serious medical condition, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or

extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation and internal quotation marks omitted). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)); *see also Sowell v. Chappius*, 695 F. Supp. 2d 16, 20 (W.D.N.Y. 2010) ("A medical need is 'serious' for constitutional purposes if it presents 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" (quoting *Chance*, 143 F.3d at 702))).

Plaintiff alleges that he suffered a fractured rib (Am. Compl. ¶ 1), and attaches to his opposition papers a report from Correctional Health Services, dated May 2, 2011, documenting "Left ribs X ray — slightly displaced fracture of left sixth rib," providing an assessment of "Fractur NOS-Closed," and prescribing narcotic pain medication of Acetominophen-Codeine. (NYC Correctional Health Services report dated May 2, 2011, annexed to Pl. Opp'n Mem. at ECF 22.) Plaintiff also attaches additional reports dated May 4, May 13, and June 13, 2011, documenting continued pain medication and "Lt. rib tenderness," (NYC Correctional Health Services report dated May 4, 2011, annexed to Pl. Opp'n Mem. at ECF 24), "no gross rib deformity, minimal rib tenderness," (NYC Correctional Health Services report dated May 13, 2011, annexed to Pl. Opp'n Mem. at ECF 26), and "rib tenderness, normal, no gross rib deformity, tender lt. chest wall," (NYC Correctional Health Services report dated June 13, 2011,

annexed to Pl. Opp'n Mem. at ECF 27).[9]  Plaintiff also attaches two earlier reports from

Correctional Health Services to the Complaint.  The first report, dated April 30, 2011, five days

after Plaintiff's arrest, describes Plaintiff complaining of "persistent pain to left side of ribs

which increases with any movement," identifies "general tenderness to posterior left rib cage"

without any "erythema swelling or bruising," and concludes with a diagnosis of

"costochondritis."  (NYC Health Correctional Services Report dated April 30, 2011.)  The

second report, dated May 1, 2011, documents that Plaintiff complained that the pain increased

after sneezing, that Plaintiff was brought from the housing area to the clinic on a stretcher, and

describes Plaintiff as in "mild distress due to pain."  (NYC Health Correctional Services Report

dated May 1, 2011.)  The report describes the pain as "nonradiating [and] sharp, . . . increas[ing]

with movement," and that an examination revealed "tenderness over left sided ribs – diffuse over

4th–8th ribs in mid axillary line."  (*Id.*)  The report concludes with an assessment of "Pain, not

otherwise specified . . . Left rib/".[10]  (*Id.*)

Defendants argue that the reports from Correctional Health Services indicate that Plaintiff

"was not suffering from a condition producing either death, degeneration, or extreme pain."

(Def. Mem. 9.)  Defendants assert that "[P]laintiff's mere allegation that he injured his left elbow

and rib area," is insufficient to be a "serious medical condition."  Defendants concede that

Plaintiff had a fractured rib, and that he was carried to the clinic on a stretcher on May 1, 2011,

but argue that "there is no indication that Plaintiff was in serious pain," relying on the clinic

---

[9]  Although these reports were not included in Plaintiff's Complaint or Statement, Defendants do not object to their submission and concede that Plaintiff "was ultimately treated for a fractured rib."  (Def. Reply 6.)

[10]  The assessment appears to continue to a second page, which is not included in Plaintiff's submissions.

report dated April 30, 2011, which indicated that Plaintiff was in "no acute distress," and had "minimal tenderness." (Def. Reply 4–5.)

The Second Circuit has noted that, "the seriousness of a delay in medical treatment *may* be decided 'by reference to the effect of delay in treatment. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (alteration omitted) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)). Defendants argue that, in light of the fact that Plaintiff's condition did not worsen between the day of his arrest and later clinic visits, his medical condition was not objectively serious. (Def. Mem. 8 (citing *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990).) Defendants assert that the April 30 and May 1, 2011 clinic reports from Correctional Health Services, documenting only "general tenderness to posterior left rib cage," "tenderness over left side ribs," and "no gross rib deformity," indicate that any delay in obtaining treatment did not exacerbate Plaintiff's medical condition, and asserted at oral argument that the fact that Plaintiff could wait for several days before visiting the jail clinic suggested that his medical condition did not rise to the level of objective seriousness. (Def. Mem. 8–9.) Defendants also argue that Plaintiff was prescribed one tablet of Ibuprofen on May 1, 2011, and Acetominophen-Codeine on May 2, 2011, for seven days, and that the five-day delay between the incident and this initial provision of pain medication is insufficient to establish a constitutional violation. (Def. Reply 6–7.)

Defendants' argument, which suggests that the seriousness of a medical condition and the associated pain *must* be evaluated in terms of the effect of delay of treatment, is without merit, particularly where the basis for Plaintiff's claim is the failure to provide any medical assistance

for several days.  *See Smith*, 316 F.3d at 185–86 ("When the basis for a [deliberate indifferent to serious medical need] claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." (emphasis omitted)).

In addition, Defendants fail to address the fact that Plaintiff's fractured rib was not diagnosed until May 2, 2011, seven days after his arrest, which, from the clinic reports, appears to be the first date that an X-ray was conducted.  The earlier clinic reports do not contradict Plaintiff's allegation that he suffered a fractured rib as no X-rays were taken on those days.  Furthermore, the clinic report dated May 1, 2011, documenting that Plaintiff was carried to the clinic on a stretcher, also supports Plaintiff's contention that he was in serious pain as a result of being assaulted with a metal pipe.  As a result, the delay in providing him with medical care weighs in favor of finding that Plaintiff had an objectively serious medical condition, in light of the evidence that Plaintiff experienced persistent pain between the date of his arrest and the date the fractured rib was initially diagnosed.  *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'").  The Court declines to afford Defendants the benefit of having delayed Plaintiff's visit to a medical provider by drawing an inference in their favor from the fact that Plaintiff's swelling, tenderness and bruising may not have worsened or improved during that time.

Under the circumstances— where Plaintiff was ultimately diagnosed with a fractured rib, complained of pain at the time of his arrest and at each subsequent clinic visit, did not receive

any medical treatment until five days after his arrest and was prescribed narcotic pain medication when he was eventually diagnosed with a fractured rib — Plaintiff's pain resulting from the fractured rib rises to the level of a serious medical condition.[11] *See McMillon v. Davidson*, 873 F. Supp. 2d 512, 514 (W.D.N.Y. 2012) (noting that "[s]evere pain can itself constitute a serious medical need for Eighth Amendment," and assuming that pain associated with a fractured rib presented a serious medical need); *Griffin v. Donelli*, No. 05-CV-1072, 2010 WL 681394, at *8 (N.D.N.Y. Feb. 24, 2010) (finding broken rib and head laceration sufficient to comprise a serious medical need) (citing *Torres v. N.Y.C. Dep't of Corr.*, No. 93-CV-6296, 1995 WL 63159, at *1 (S.D.N.Y. Feb. 15, 1995)).

In sum, Plaintiff's fractured rib, the associated pain and the delay in obtaining medical treatment are sufficient to comprise an objectively serious medical need, which was diagnosed one week after he surrendered.

### ii. Deliberate indifference

Plaintiff argues that Giuca's taking photographs of Plaintiff's injuries, and Giuca's admission that he was "informed of the injuries Plaintiff sustained from being assaulted by Rodwell Jones with the metal pipe on April 25, 2011," establish that Giuca's conduct rises to the

---

[11] Defendants rely on *Torres v. N.Y.C. Dep't of Corr.*, No. 93-CV-6296, 1995 WL 63159 (S.D.N.Y. Feb. 15, 1995), to argue that Plaintiff's "broken rib was not a serious medical condition as [P]laintiff did not need hospitalization." (*See* Def. Reply 4.) Defendants mischaracterize *Torres*. In *Torres*, the district court addressed a claim brought by a plaintiff who sustained a broken rib as a result of a beating by prison guards, and was treated at the jail clinic. Torres, 1995 WL 63159, at *1. The plaintiff claimed that the denial of his request to go to a hospital was medical mistreatment, and the district court dismissed the claim because the plaintiff had been promptly treated at the jail clinic, and "[n]othing in the complaint suggests that plaintiff actually required hospitalization, or would have received better medical treatment at a hospital." *Id.* In contrast, here, Plaintiff was deprived of any medical care for five days, and his claim is based on Defendants' refusal to provide him with access to medical care, and not on a request to be taken to the hospital instead of being treated at the jail clinic.

level of deliberate indifference.  (Pl. Opp'n Mem. 5.)  Plaintiff also cites to Giuca's statement to

Plaintiff that "if [Plaintiff] were to go to the hospital, [Giuca] would make sure it would take

much longer for me to get to court."  (Statement ¶ 4; Pl. Opp'n Mem. 5.)  According to the

transcript labeled "suppression" attached to Plaintiff's Statement, Giuca testified that Plaintiff

"told us at the scene and . . . back at the interview room that he was struck with the pipe."[12]

(Suppression Hearing Tr. 50:6–8.)

To show that a defendant was "deliberately indifferent" to a detainee's serious medical

condition, a plaintiff must show that the defendant "knew of and disregarded an excessive risk to

[the detainee's] health or safety and that [the defendant] was both aware of facts from which the

inference could be drawn that a substantial risk of serious harm existed, and also drew the

inference."  *Caiozzo*, 581 F.3d at 72 (2d Cir. 2009) (alteration omitted) (quoting *Farmer v.

Brennan*, 511 U.S. 825, 837 (1994)); *Curcione*, 657 F.3d at 122 (same); *see also Nielsen*, 746

F.3d at 63 ("Deliberate indifference is a mental state equivalent to subjective recklessness.  This

mental state requires that the charged official act or fail to act while actually aware of a

substantial risk that serious inmate harm will result." (quoting *Salahuddin*, 467 F.3d at 280));

*Lapierre v. County of Nassau*, 459 F. App'x 28, 30 (2d Cir. 2012) ("The official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." (alteration omitted) (quoting *Hathaway v.

Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *Salahuddin*, 467 F.3d at 280 ("The reckless official

need not desire to cause such harm or be aware that such harm will surely or almost certainly

result.  Rather, proof of awareness of a substantial risk of the harm suffices.").  "[A]wareness

---

[12]  The Court reviews the transcript as a document attached to the Complaint.  *See Sira*,
380 F.3d at 67.

may be proven 'from the very fact that the risk was obvious.'" *Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 842 (1994))).

Plaintiff's allegations that Giuca was aware that Plaintiff had been assaulted with a metal pipe and Giuca's acknowledgment that he was aware of the assault to Plaintiff and the fact that Plaintiff said he was in pain, are sufficient to show that Giuca was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed." *See Caiozzo*, 581 F.3d at 72. While these allegations alone do not show that Giuca drew the inference that a substantial risk of serious harm existed, Giuca's testimony at the suppression hearing that "[w]e asked do you want EMS to take a look at you," (Suppression Hearing Tr. 50:23), supports an inference that Giuca more likely than not drew this inference.[13] *See Bradway v. Town of Southampton*, 826 F. Supp. 2d 458, 470 (E.D.N.Y. 2011) (finding that subjective component of deliberate indifference test was met where the plaintiff "presented evidence that at least one of the defendant officers stated that [the plaintiff] needed to go to the hospital"). Although Giuca testified that Plaintiff refused to have EMS look at him, (*id*. at 50:23–24), Plaintiff contests this assertion, stating in his complaint that he "requested medical attention and was told that [he] would see EMS once processed at the 70th Precinct," and that he informed both King and Giuca of his "sustained injuries and pain," and requested that he be taken to the hospital. (Statement ¶¶ 3–4.) The Court assumes that the facts presented in the Complaint are true for purposes of

---

[13] Plaintiff also argues that the fact that Giuca took photographs of "where on [Plaintiff's] body [he] was struck with the metal pole," (Pl. Opp'n Mem. 5) indicates that Giuca was deliberately indifferent to Plaintiff's medical need. Plaintiff's rationale is unclear; if anything, the photograph is more plausibly explained as an effort to document that Plaintiff was not badly injured, at least from external appearances. At the suppression hearing, Giuca stated that he "did not know why specifically" he took the photograph of Plaintiff, and that he "just took photos of him." (Suppression Hearing Tr. 226:18–20.)

this motion.

Defendants point to Giuca's testimony that Plaintiff did not seem to have trouble lifting his shirt and arm when Giuca asked him to do so, "which gave [Giuca] the indication that there was no injury there." (Def. Mem. 9–10 (citing Suppression Hearing Tr. 50:11–16).) Giuca also stated that he did not see bruising, and, based on this visual appearance and Plaintiff's lifting his shirt and arm, he "didn't believe that [Plaintiff] was hurt." (Suppression Hearing Tr. 50:11–19.) While this statement by Giuca is at odds with him asking whether Plaintiff wanted EMS to take a look at him, it does not negate a finding that Plaintiff has plausibly stated that Giuca in fact drew the inference that there was a substantial risk of harm such that Plaintiff might need the assistance of EMS.[14] On a motion for judgment on the pleadings, where the Court merely assesses whether Plaintiff has stated a plausible claim and draws every inference in favor of Plaintiff, the Court cannot conclude that Giuca's testimony, which suggests both that he believed that Plaintiff was injured seriously enough to require EMS, and that Giuca did not believe that Plaintiff was injured, requires a finding that Plaintiff has failed to state a plausible claim of deliberate indifference.

Unlike his allegations regarding Giuca, Plaintiff fails to provide sufficient factual allegations regarding the actions of King, and discusses only Giuca in his opposition papers. A plaintiff "must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in [her] individual capacity under § 1983." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004). Here, Plaintiff alleges only that he

---

[14] This is particularly so where Giuca's querying Plaintiff whether Plaintiff wanted to have "EMS take a look at" Plaintiff was, according to Giuca's suppression hearing testimony, made contemporaneously with Plaintiff's arrest, while Giuca's statement indicating that he did not believe that Plaintiff was injured was made later, during the suppression hearing.

informed King of his "sustained injuries and pain," (Statement ¶ 4), and requested to go to the hospital, but provides no other relevant factual allegations regarding King's participation in the alleged deprivation. Because Plaintiff has alleged insufficient facts showing that King was personally involved in Plaintiff's deprivation of medical treatment, the deliberate indifference to serious medical need claim as to King is dismissed without prejudice to amend within 30 days of this Memorandum and Order, to provide factual allegations to support a claim against King.

### d. Municipal Liability

Plaintiff alleges that the City of New York, through "its employees['] direct actions, intentionally, maliciously, and with reckless disregard for and deliberate indifference to [P]laintiff's rights, created or allowed the policy or custom to continue under which unconstitutional practices occurred." (Compl. 2.) Plaintiff also alleges that an unspecified "supervisor was grossly negligent in managing subordinates who caused the act," and "[i]n addition to or in the alternative, defendant City of New York under color of law created and maintained an official practice and/or custom of [f]ailing to adequately train, monitor and supervise the employees regarding their constitutional duty . . . ." (*Id*. at 2–3.)

In order to sustain a claim for relief pursuant to § 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); *see Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the

unconstitutional actions of its employees, a plaintiff is required to plead and prove three

elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a

denial of a constitutional right." (alteration in original) (quoting *Wray v. City of New York*, 490

F.3d 189, 195 (2d Cir. 2007))).  A policy or custom may be established by any of the following:

(1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by

municipal officials with decision-making authority; (3) a practice so persistent or widespread that

it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a

failure by policymakers to properly train or supervise their subordinates, such that the

policymakers exercised "deliberate indifference" to the rights of the plaintiff.  *See Parker v. City

of Long Beach*, --- F. App'x ---, 2014 WL 1507707, at *2 (2d Cir. Apr. 18, 2014), *as amended*,

(Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, --- F.3d ---, 2014 WL

700718, at *24 (2d Cir. Feb. 25, 2014) (persistent and widespread practice); *Hines v. Albany

Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of

Rochester*, --- F. App'x ---, 2014 WL 494893, at *9 (2d Cir. Feb. 7, 2014) (failure to train or

supervise); *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy

and act of a person with policymaking authority for the municipality).

Plaintiff's Complaint alleges that, during the booking process, Giuca told him, in

response to Plaintiff's request for medical attention, that if Plaintiff "were to go to the hospital,

[Giuca] would make sure it took much longer for [Plaintiff] to get to court."  (Statement ¶ 4.)

Plaintiff argues that Giuca's deliberate indifference to Plaintiff's medical needs "led him to

pursue the 'unspoken and widely accepted policy' of denying much needed medical attention, so

as not to delay the booking process."  (Pl. Opp'n Mem. 7 (quoting New York Daily News

article).)  Plaintiff also alleges that the City of New York "was aware of members of the police

department['s] flagrant abuse of constitutional rights, . . . due to the numerous alleged violations and charges brought against its police officers and lawsuits in the past that the City paid in response to such abuse." (Compl. 3.) Plaintiff cites to a New York Daily News article, which cites attorneys as stating that "NYPD Officers threaten people they arrest with extra time in custody, to keep them from getting the treatment they need," and that "cops take a dim view of interrupting the booking process to take a prisoner to the hospital." (Pl. Opp'n Mem. 16 (quoting New York Daily News article).) The Court construes Plaintiff's claim of municipal liability as alleging (1) an unconstitutional practice of municipal officials that "was so persistent or widespread as to constitute a custom or usage with the force of law," *Patterson*, 375 F.3d at 226, and (2) a failure to supervise or train.

### i. Persistent and widespread practice

The Second Circuit has recognized that, in the context of municipal liability, the "policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Courts in this circuit have found allegations of municipal inaction in the face of government-documented misconduct through investigations of which defendants were aware, sufficient to state a claim of municipal liability based on policy or custom. *See Graham v. County of Erie*, No. 11-CV-605S, 2012 WL 1980609, at *6 (W.D.N.Y. May 31, 2012) (denying motion to dismiss where plaintiff "points out several similar situations [to the plaintiff's own experience of being denied medical care during pretrial detention] documented by the Civil Rights Division of the U.S. Department of Justice during its recent two-year investigation of the conditions at the Holding Center" where the plaintiff was detained); *Bektic-*

*Marrero v. Goldberg*, 850 F. Supp. 2d 418, 431 (S.D.N.Y. 2012) (denying motion to dismiss claim of municipal liability where the plaintiff attached to her complaint a report by the United States Department of Justice ("DOJ") concluding that the county defendant's "provision of medical care to inmates was constitutionally deficient in several respects," and "high-ranking prison officials were advised of the DOJ's preliminary findings" prior to the incident giving rise to the claim); *United States v. Erie Cnty., NY*, 724 F. Supp. 2d 357, 360 (W.D.N.Y. 2010) (applying § 1983 standard for municipal liability to deny motion to dismiss plaintiff's claim where the DOJ had "notified Erie County through a 'Findings Letter' that, in its view, confinement conditions at the facilities violated the federal constitutional rights of inmates incarcerated there," and finding that the Findings Letter, considered in conjunction with the Complaint, "present[ed] plausible claims" under the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. § 1997 *et seq.*).

Some courts have found that evidence of misconduct with strong similarities to a plaintiff's individual claim may suffice to allege a plausible claim of municipal liability. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991) (reversing denial of summary judgment on municipal liability claim where plaintiffs cited three reports related to the arrest practices of the defendants, "citations to newspaper articles," descriptions of "a dozen or more instances of alleged, conceded, or adjudicated improper arrests" in their complaint); *Castilla v. City of New York*, No. 09-CV-5446, 2012 WL 3871517, at *5 (S.D.N.Y. Sept. 6, 2012) (finding plaintiff stated a plausible claim of municipal liability where she "alleges various other instances of male police officers taking sexual advantage of females under their custody or control"); *Michael v. County of Nassau*, No. 09-CV-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (finding that plaintiff stated a claim of municipal liability where "the Complaint pleads

sufficient facts to infer that Nassau County had . . . an informal policy, or a custom, of at least tolerating police misconduct" and the plaintiff had alleged "not . . . one isolated incident of police misconduct . . . [but rather] multiple incidents over a long, continuous time period").

Other courts have found that a plaintiff can state a plausible claim of municipal liability by citing to cases or complaints in state or federal court alleging similar misconduct against the same set of defendants. *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (denying defendant's motion to dismiss plaintiffs' claim of municipal liability where "[t]he Amended Complaint points to over fifteen cases where City prosecutors allegedly committed misconduct, and alleges the existence of many more such cases," as evidenced by unpublished judicial decisions), *appeal dismissed*, 509 F. App'x 43 (2d Cir. 2013); *Osterhoudt v. City of New York*, No. 10-CV-3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) (finding that the plaintiff stated a plausible claim of municipal liability where he "cites a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis"); *Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009) (finding that plaintiff stated a plausible claim of municipal liability based on a review of "cases in other federal and state courts, [which] revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department," and "evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged").

Here, Plaintiff relies on a New York Daily News newspaper article describing lawsuits filed on behalf of individuals with diabetes who were denied access to their insulin during the

arrest and booking process.  (*See* New York Daily News article).  The article appears to

summarize "nearly a dozen such court cases," that settled, and includes quotes from two of the

attorneys for the plaintiffs in some of those cases.  Plaintiff focuses on the assertion by "several

lawyers" who filed these suits "who say cops take a dim view of interrupting the booking process

to take a prisoner to the hospital," an observation that resonates with the facts of Plaintiff's

arrest.

Accepting the allegations in the Complaint — that "Defendant City of New York was

aware of members of the police department['s] flagrant abuse of constitutional rights . . . . due to

the numerous alleged violations and charges brought against its police officers and lawsuits in

the past that the City paid in response to such abuse" — as true, Plaintiff's allegations are

sufficient, perhaps just barely, to plausibly state a claim of municipal liability based on Plaintiff's

allegation that the City has an alleged policy of permitting officers to deny medical treatment to

pre-trial detainees, so as not to delay the booking process, by threatening arrestees with

additional time in custody prior to arraignment.

### ii.    Failure to train

The Complaint does not state a claim of municipal liability based on Plaintiff's allegation

that the City of New York "fail[ed] to adequately train, monitor, and supervise the employees

regarding their constitutional duty to [P]laintiff's constitutional rights."  (*See* Compl. 3.)  "The

failure to train or supervise city employees may constitute an official policy or custom if the

failure amounts to 'deliberate indifference' to the rights of those with whom the city employees

interact."  *Wray v. City of New York*, 490 F.3d 189, 195–96 (2d Cir. 2007) (quoting *City of*

*Canton v. Harris*, 489 U.S. 378, 388 (1989)).  In order to establish a claim of municipal liability

based on failure to adequately train and supervise, a plaintiff must establish that "defendants

knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Reynolds*, 506 F.3d at 192. "Deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alteration, citations and internal quotation marks omitted). Where the City "has a training program, a plaintiff must . . . identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Wray*, 490 F.3d at 196 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting *City of Canton*, 489 U.S. at 390–91).

Plaintiff offers no evidence concerning the City of New York's training of officers, or lack thereof, with respect to providing for the medical needs of pre-trial detainees. Plaintiff's general allegation that the City "was aware of member of the police department['s] flagrant abuse of constitutional right[s] . . . due to the numerous alleged violations and charges brought against its police officers and lawsuits in the past," is insufficient to plausibly state a claim that there is "a specific deficiency in the city's training program and that the deficiency is closely related to [Plaintiff's] ultimate injury, such that it actually caused" Plaintiff's constitutional

deprivation. Plaintiff's claim of municipal liability based on the City's failure to train its agents is dismissed. Plaintiff is granted 30 days leave to amend the Complaint to provide additional factual allegations supporting this claim.

### e. Equal Protection

In his opposition papers, Plaintiff discusses his denial of medical care together with a "deprivation of equal protection" claim.[15] The equal protection clause prohibits government officials from intentionally discriminating against individuals based on their race, ethnicity, gender or national origin. *See Ross v. New Canaan Envtl. Comm'n*, 532 F. App'x 12 (2d Cir. 2013) ("To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 48–49 (2d Cir. 1999))); *see also Paterson*, 594 F.3d at 162 ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." (quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976))); *Collier v. Barnhart*, 473 F.3d 444, 448 (2d Cir. 2007) ("To make out a claim for gender discrimination under the Equal Protection Clause, the plaintiff must prove that [he or] she suffered purposeful or intentional discrimination on the basis of gender." (alteration omitted) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004))); *Jana-Rock Const., Inc. v. N.Y.S. Dep't of Econ. Dev.*, 438 F.3d 195, 200 n.1 (2d Cir. 2006) (noting that the Supreme Court "has thus far reserved most

---

[15] The Court and Defendants did not initially understand Plaintiff's Complaint to assert an equal protection claim and as a result, Defendants only addressed the claim at oral argument, asserting that it is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Because Plaintiff's Complaint lacks sufficient factual allegations to state an equal protection claim, and because the issue of whether Plaintiff's equal protection claim is barred by *Heck* has not been fully briefed to the Court, the Court declines to address Defendants' argument.

stringent judicial scrutiny [of equal protection claims] for classifications based on race or national origin" (quoting *United States v. Virginia,* 518 U.S. 515, 532 n.6 (1996))).

The Equal Protection Clause also has been construed to allow for a "class of one" claim, where a plaintiff "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32 (2d Cir. 2014) (alterations omitted) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *see also Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (same) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

In addition, the Second Circuit has also "recognized that the Equal Protection Clause may be violated by selective enforcement or selective adverse treatment." *Bush v. City of Utica, N.Y.*, 558 F. App'x 131, 134 (2d Cir. 2014). A plaintiff who asserts such a claim "must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the 'treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Id.* (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)); *see also DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *5 (E.D.N.Y. Mar. 20, 2014) (discussing selective enforcement equal protection claims).

At oral argument Plaintiff clarified that his equal protection claim was based on the differential treatment provided by Defendants to Rodwell Jones, the individual who allegedly assaulted Plaintiff with a metal pipe, and against whom Plaintiff was allegedly defending himself

in the incident resulting in Plaintiff's arrest.[16]  Plaintiff's statement suggests that he is attempting

to assert either a selective enforcement claim, or a class-of-one claim asserting that he was

treated differently from Jones, with no rational basis for the difference in treatment.

Plaintiff's Complaint provides insufficient factual allegations to state an equal protection

claim under either theory.  Plaintiff alleges that Jones struck him with a metal pipe, and that

Plaintiff was arrested and was not "allowed" to bring a criminal complaint against Jones.  It is

unclear if Plaintiff is alleging that they were treated differently because Plaintiff was arrested

while Jones was not, or because Plaintiff was not permitted to make an assault complaint against

Jones, but Jones was permitted to file a complaint against Plaintiff.[17]  Furthermore, Plaintiff fails

to provide any factual allegations establishing that any differential treatment by Defendants was

the result of "impermissible considerations such as race, religion, intent to inhibit or punish the

---

[16]  Plaintiff relies on *Torres v. Chicago*, a decision that Plaintiff characterizes as finding that a "one and a half hour delay in summoning medical aid for a dying individual was actionable on a deprivation of equal protection claim."  (Pl. Opp'n Mem. 8.)  The Court assumes that Plaintiff refers to *Torres v. City of Chicago*, 194 F. Supp. 2d 790, 793 (N.D. Ill. 2002), where the administrator of a gunshot victim's estate argued that a one and a half hour delay by police in summoning medical care for a gunshot victim violated the decedent's right to equal protection of the laws.  *See Torres*, 194 F. Supp. 2d at 793.  The court in *Torres* accepted the allegations as constituting a claim for equal protection because the plaintiff, in arguing a class-of-one equal protection claim, argued that the officers had treated similarly-situated gunshot victims differently from their treatment of the plaintiff on the night of the incident.

[17]  Plaintiff's Statement and opposition papers refer to the fact that he was prevented from making an assault complaint against Rodwell Jones, Plaintiff's alleged assailant.  (Statement ¶ 4; Pl. Opp'n Mem. 6.)  To the extent that Plaintiff makes this assertion as the basis for an independent § 1983 claim, "the law is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual."  *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316–17 (W.D.N.Y. 2004) (citing *Leeke v. Timmerman*, 454 U.S. 83 (1981), *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) and *Ostrowski v. Mehltretter*, 20 F. App'x 87 (2d Cir. 2001)); *see also Martinez v. County of Suffolk*, --- F. Supp. 2d ---, ---, 2014 WL 775058, at *3 (E.D.N.Y. Feb. 27, 2014) ("There is . . . no constitutional right to an investigation by government officials." (quoting *Stone v. Department of Investigation of New York*, 1992 WL 25202, at *2 (S.D.N.Y. Feb. 4, 1992))).

exercise of constitutional rights, or malicious or bad faith intent to injure" him, as required to establish a selective enforcement claim. *See Bush*, 558 F. App'x at 134. Nor does the Complaint provide factual allegations sufficient to show that Jones was "similarly situated" to Plaintiff, as required to establish a class of one claim. *See Fortress Bible*, 694 F.3d at 222 ("[A] class-of-one claim requires a plaintiff to show an extremely high degree of similarity between [himself] and [his] comparators." (citing *Ruston v. Town Bd. for Skaneateles,* 610 F.3d 55, 59–60 (2d Cir. 2010))).

The Court grants Defendants' motion to dismiss Plaintiff's equal protection claim, but grants Plaintiff 30 days leave to amend the Complaint to provide factual allegations that would sufficiently state an equal protection claim.

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for judgment on the pleadings. The Court denies Defendants' motion as to Plaintiff's claim for deliberate indifference to serious medical need against Giuca, and Plaintiff's claim of municipal liability based on the City's "widespread or persistent" custom of permitting officers to deny medical treatment to pre-trial detainees by threatening arrestees with additional time in custody. The Court grants Defendants' motion as to Plaintiff's claims of due process violations against all Defendants.[18] The Court also grants Defendants' motion as to Plaintiff's claims of (1) deliberate

---

[18] This claim is dismissed without prejudice to reinstate only once the *Heck* conditions are met. "Disposition of the case on *Heck* grounds . . . warrants only dismissal *without* prejudice, because the suit may be reinstituted should plaintiff's conviction be 'expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'" *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999); *see also Erber v. Hess*, 112 F. App'x 95, 96 (2d Cir. 2004) ("[C]ases dismissed on *Heck* grounds should be disposed of without prejudice." (citing *Amaker*, 179 F.3d at 52)); *McCord v. City of New York*, No. 13-CV-2008, 2014 WL 2567108, at *6 (S.D.N.Y. June

indifference to serious medical need as to King, (2) municipal liability based on Defendants' failure to train officers, and (3) equal protection claim as to all Defendants, without prejudice. Plaintiff is granted 30 days leave to file an amended complaint to include factual allegations in support of these three claims to the extent he can. In his Amended Complaint, Plaintiff should also include the evidence of lawsuits or incidents relied on by Plaintiff in support of his municipal liability claim. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED:

                                                                      s/MKB
                                         MARGO K. BRODIE
                                         United States District Judge

Dated: August 11, 2014
       Brooklyn, New York

---

6, 2014) ("*Heck* permits only without-prejudice dismissal because the claim may be reinstated should Plaintiff's conviction eventually be invalidated." (citing *Amaker*, 179 F.3d at 52)).