UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES HUNTER,<br><br>　　　　　　　　Plaintiff,<br><br>　– against –<br><br>THE CITY OF NEW YORK and GIUSEPPE GIUCA,<br>in His Individual and Official Capacities,<br><br>　　　　　　　　Defendants. | 12-CV-06139 (MKB) (RML)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff James Hunter, for his complaint against Defendants Giuseppe Giuca and the City of New York, states as follows:

## INTRODUCTION

1. For decades, the City of New York has fought to reduce delays in the processing of pretrial detainees. This mission has been pursued at all costs: in the name of faster processing, arrestees have been denied critical medical attention, resulting in grave, long-term health problems, and in the most tragic cases, even death. Four years ago, Plaintiff became the latest casualty of this aggressive mission: an assailant cracked his ribs with a metal rod, and—rather than granting him the medical attention that he persistently requested—his arresting officers left him to languish in a prison cell. When he requested the opportunity to make a complaint against his assailant, he was denied this opportunity as well—on the arbitrary basis that his assailant had already made a complaint against him.

2. This is an action for money damages, declaratory, and injunctive relief brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States

Constitution, against Defendants Giuseppe Giuca, in his individual and official capacities, and the City of New York. Defendant Giuca denied Plaintiff medical assistance following an assault against him, and arbitrarily denied him the right to make a cross-complaint against his assailant. These constitutional violations were committed as a result of the policies and customs of the City of New York, and the City of New York is liable for the misconduct committed by Defendant Giuca.

### JURISDICTION AND VENUE

3. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's causes of action, which arise under the Constitution of the United States and 42 U.S.C. § 1983.

4. Venue lies in the Eastern District of New York because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Kings County, New York. 28 U.S.C. § 1391(b)(2).

### THE PARTIES

5. Plaintiff James Hunter is an adult citizen of the United States, and was, at all relevant times herein, a resident of Kings County in the State of New York. He is incarcerated at the Sullivan Correctional Facility in Fallsburg, New York, where he is serving a term of imprisonment of 12 years. Before his incarceration, he was self-employed in the construction industry.

6. Defendant Giuseppe Giuca was, at all times relevant herein, an Officer of the 70th Precinct of the New York Police Department (the "NYPD"). He now holds the title of Detective. He is sued in his individual and official capacities.

7. Defendant The City of New York (the "City") is a municipal corporation and the public employer of Defendant Giuca. The City is headquartered in New York County, New

York. It was created and authorized under the laws of the State of New York to maintain the NYPD, which acts as the City's instrumentality in the area of law enforcement. The City is legally responsible for the conduct, actions, and unlawful omissions of the NYPD.

## BACKGROUND

### A. The Arrest

8. On April 25, 2011, while sitting in his truck outside his home, Plaintiff was attacked by a longtime acquaintance, Rodwell Jones. Earlier in the day, Jones and Plaintiff had exchanged phone calls, and Jones had threatened Plaintiff. On the last of these calls, Jones told Plaintiff that he was coming to "find" him and asked for Plaintiff's whereabouts. In an attempt to avoid a confrontation, Plaintiff misled Jones about his location. But Jones eventually found him that afternoon outside his home, in Brooklyn, after canvassing the surrounding area.

9. When he spotted Plaintiff's truck, Jones, who had been driving fast, came to a screeching halt in the middle of the street. Leaving the engine running, he sprung from the driver's seat, with a long metal rod in hand. Now on guard, Plaintiff rooted around in his truck for a means of defense. Jones swung the rod and, before Plaintiff could move out of the way, struck him hard—first across his left elbow and then across the left side of his torso, breaking Plaintiff's rib and injuring his left elbow. Plaintiff managed to find a knife in a toolbox that he had used to repair the truck's transmission, and attempted to defend himself with the knife. In the resulting scuffle, Jones sustained knife injuries. Plaintiff left the scene to seek medical assistance and to contact his mother and sister. The police were summoned shortly afterwards.

10. Shortly after the incident, Plaintiff was contacted by telephone by a police officer who described himself as "Captain Taylor." Captain Taylor explained that Plaintiff's altercation with Jones had been caught on video surveillance. Captain Taylor claimed to have reviewed the footage, which he said showed Plaintiff defending himself after being assaulted by Jones.

3

Captain Taylor encouraged Plaintiff to cooperate with the police investigation by meeting them at the scene of the incident. Plaintiff told Taylor that Jones had injured him, and he requested medical attention for his injuries. Captain Taylor told Plaintiff that if he cooperated, he would have the opportunity to seek treatment afterwards. Believing that he had acted in self-defense and that the surveillance video would confirm as much, Plaintiff voluntarily returned to the scene, where he spoke with Captain Taylor and Defendant Giuca. He told them that Jones had struck him with a metal rod (which he showed to Giuca at the scene), that he was in severe pain, and that he required medical attention. Giuca assured Plaintiff that he would receive medical care at the Precinct.

11. Needing treatment for his injuries, and believing, based on Captain Taylor's statement, that the video would demonstrate that he had acted in self-defense, Plaintiff voluntarily surrendered. In the car on the way to the Precinct, Plaintiff continued to plead with Giuca for medical attention. He was transported to the 70th Precinct, where Giuca processed him. Giuca and Detective Mechelle King then read Plaintiff his *Miranda* rights and proceeded to interrogate him.[1]

### B. Plaintiff Continues to Request Medical Assistance

12. By the time Plaintiff arrived at the 70th Precinct, his injuries were causing him significant pain. He made several additional requests for medical assistance to Giuca, explaining that Jones had hit him with a metal rod and complaining of severe pain in his left chest and arm. At Giuca's request, Plaintiff lifted his shirt to show his injuries and allowed Giuca to photograph

---

[1] The Complaint Room Screening Sheet indicates that Plaintiff was arrested after Jones "canvassed for" him and struck him with a metal pipe, and that Plaintiff stabbed Jones. A copy of the Complaint Room Screening Sheet is attached as Exhibit 1.

them.[2] Plaintiff again requested medical assistance. Giuca twice warned him that if he chose to visit Emergency Medical Services before his arrest was processed, Giuca would "make sure" that it would "take . . . longer to get to court." Growing tired of Plaintiff's requests, Giuca tried to quiet him by offering him cigarettes.

13. Giuca took no notes of Plaintiff's complaints about his injuries or his requests for medical assistance.

### C. Plaintiff Attempts to File a Complaint Against Jones

14. In addition to requesting treatment for his injuries, Plaintiff made it clear to both Giuca and King that Jones had attacked him first. Plaintiff explained that he had acted solely in self-defense. Plaintiff pleaded with Giuca to allow him to file a complaint against Jones. Giuca refused, informing Plaintiff that the NYPD already had a 911 complaint—a complaint from Jones—and that if Plaintiff wished to file his own cross-complaint, he would need to get permission from the District Attorney. When Plaintiff again requested the opportunity to make a complaint, Giuca told him that he could not do so at this stage in the proceedings.

15. Following his arrest and for several months thereafter, Plaintiff remained intent on filing a complaint. Believing, based on Giuca's instruction, that he needed the permission of the District Attorney, he asked his attorney to write to the District Attorney's office. In addition, on September 21, 2011, Plaintiff's trial attorney, Jonathan A. Fink, wrote to Assistant District Attorney Ron Snyder enclosing documents in support of Plaintiff's claim of self-defense.[3]

---

[2] Suppression Hr'g Tr. at 50–51, May 16, 2012. Excerpts from the May 16, 2012 Suppression Hearing are attached as Exhibit 2.

[3] A copy of Fink's letter to ADA Snyder is attached as Exhibit 3.

5

Plaintiff eventually wrote on his own to ADA Snyder, in November 2011, seeking to initiate a criminal complaint against Jones. Plaintiff received no response.[4]

### D. The Medical Examinations

16. After his arrest and processing on April 25, 2011, Plaintiff was taken into custody and held on bail at the Rikers Island, Otis Bantum Correctional Center. When he was first processed there, on April 27, 2011, he once again requested immediate medical treatment. The prison guards behaved as though Mr. Hunter was malingering, and refused to accept that he was really in pain. Over the next few days, Plaintiff continued to complain about the pain in his ribs and elbow and made numerous requests to the prison guards for medical treatment. Despite these requests, his injuries went untreated.

17. By April 30, 2011—five days after he was struck with the metal rod—Plaintiff was still experiencing significant pain on the left side of his chest and on his left arm. He was eventually allowed to be seen by a member of the New York City Health Correctional Health Services: Joan Downes. During the appointment, Plaintiff told Ms. Downes that he had been assaulted several days earlier and asked whether he could go to the hospital for a thorough medical examination. Plaintiff told Ms. Downes that he was experiencing persistent pain in his left ribs, which increased with movement. Ms. Downes examined Plaintiff and reported that he was experiencing "general tenderness to [the] posterior left rib cage" and that his left elbow had "minimal tenderness to palpation, and minimal swelling." The assessment concluded that

---

[4] A copy of Plaintiff's letter to ADA Snyder is attached as Exhibit 4. Plaintiff later filed an Internal Affairs complaint (#13-18035) with respect to all of his claims with Lieutenant Craig Nilson of the NYPD Internal Affairs Bureau. Lieutenant Nilson visited Plaintiff at Rikers Island in connection with Plaintiff's complaint. However, following that visit, Plaintiff received no further information about the status of his complaint.

Plaintiff was suffering from Costochondritis, inflammation of the cartilage that connects the rib to the breastbone.[5]

18.  The next day—now six days after being struck with the metal rod—Plaintiff's pain had still not subsided, and he was having profound trouble moving. Unable to stand up after a sneeze forced him to collapse in pain, he was carried to the prison medical clinic on a stretcher because he could not walk without great difficulty and was having trouble breathing. He was examined by Dr. Harjinder Bhatti of the New York City Health Correctional Health Services. Plaintiff told Dr. Bhatti that he had experienced intermittent pain in his left ribs for the past five to seven days after being struck with a metal rod. Dr. Bhatti reported: "Today, after sneezing, [Mr. Hunter's] pain recurred. Pain is non-radiating, sharp. Plaintiff was brought from the housing area to the clinic on a stretcher. Pain increases with movement." Dr. Bhatti's examination summary noted that Plaintiff was "in mild distress due to pain" and that he was experiencing "tenderness over left sided ribs – diffuse over 4th–8th ribs in mid axillary line." Plaintiff finally received a chest X-ray, which, according to Dr. Bhatti's "preliminary reading," showed a "fracture 6th left rib." To treat Plaintiff's pain, Dr. Bhatti prescribed Ibuprofen and advised "[n]ot to lift heavy weight."[6]

19.  The next day, May 2, 2011, Plaintiff had a follow-up appointment with Dr. Bhatti. He told Dr. Bhatti that he was continuing to experience pain in his left side and that the pain was increasing with movement. Reporting on the results of a chest X-ray, Dr. Bhatti concluded that Plaintiff had sustained a "slightly displaced fracture of [the] left sixth rib." Plaintiff was prescribed a stronger pain relief medication, Acetaminophen–Codeine, and was also referred to

---

[5] A copy of Ms. Downes's Clinical Report is attached as Exhibit 5.
[6] A copy of Dr. Bhatti's Clinical Report is attached as Exhibit 6.

7

Orthopedics.[7] This was the first time in the *seven days* after being assaulted that Plaintiff received medicine strong enough to provide some relief from the pain that he was experiencing.

20. On May 4, 2011, Plaintiff had another clinical appointment, with Charles Appiah, a registered physician's assistant, of the New York City Health Correctional Health Services. Plaintiff described his injuries and their cause to PA Appiah, who reported "[left] rib tenderness" and "very mild swelling" of Plaintiff's left elbow. The assessment concluded that Plaintiff was experiencing "joint pain . . . , [left] elbow contusion [and] fracture [to the] rib." Plaintiff's pain medication prescription was continued.[8]

21. On May 13, 2011, Plaintiff was still experiencing significant pain. He was treated by Dr. Jean-Joseph Janvier of the New York City Health Correctional Health Services. After an examination, Dr. Janvier assessed Plaintiff as having a "fracture" and "rib pain." He prescribed an anti-inflammatory medication, Naprosyn.[9]

22. One month later, nearly seven weeks after being assaulted, Plaintiff was still in significant pain. He visited Dr. Lester Lieberman of the New York City Health Correctional Health Services, complaining of pain in his left ribs as a result of having been assaulted with a metal pipe on the day of his arrest. Dr. Lieberman observed "rib tenderness . . . , tender l[eft] chest wall," and noted Plaintiff's fracture to the "left 6th rib." Plaintiff was again prescribed Tylenol to treat his pain and was referred to Orthopedics. Dr. Lieberman recommended a follow-up appointment four weeks later.[10]

---

[7] A copy of Dr. Bhatti's Second Clinical Report is attached as Exhibit 7.
[8] A copy of PA Appiah's Clinical Report is attached as Exhibit 8.
[9] A copy of Dr. Janvier's Clinical Report is attached as Exhibit 9.
[10] A copy of Dr. Lieberman's Clinical Report is attached as Exhibit 10.

8

23. Plaintiff continued to experience physical pain and discomfort from these injuries for another full year. At times, his ribs hurt so badly that he had trouble breathing and could not sleep.

### E. The Surveillance Video

24. As noted above, on the day of Plaintiff's arrest, Captain Taylor informed Plaintiff that a surveillance video had recorded the incident and that in Captain Taylor's view, it showed that Plaintiff had acted in self-defense when he struck Jones. As part of his investigation, Giuca obtained the surveillance tape approximately one week after Plaintiff's arrest.[11] He could not view the video on his computer, yet he did not attempt to open it on another computer to confirm that the video worked, even though he knew that the footage would likely be deleted within a month of the incident.[12] But not until on or after March 2012—nearly a *full year* after Plaintiff's arrest—did he provide the tape to the Assistant District Attorney responsible for Plaintiff's criminal proceeding.[13] The Assistant District Attorney then discovered that the tape had been corrupted and could not be fixed.

25. Because of the delay, a backup tape could not be recovered in time for Plaintiff's trial, which began on September 4, 2012. Although the trial judge refused to instruct the jury to draw an adverse inference about the tape's destruction, he commented, in reference to the tape, that Giuca "should have followed up upon not being able to open it, [and] he should have been more diligent in trying to obtain another copy . . . . [H]e let it sit until it was time to hand it over

---

[11] Trial Tr. at 214, Sept. 10, 2012. Excerpts from the September 10, 2012 Criminal Trial transcript are attached as Exhibit 11.

[12] Suppression Hr'g Tr. at 40–44, May 16, 2012. Excerpts from the May 16, 2012 Suppression Hearing transcript are attached as Exhibit 2.

[13] Suppression Hr'g Tr. at 8–9, May 16, 2012. Excerpts from the May 16, 2012 Suppression Hearing transcript are attached as Exhibit 2.

9

to the [Assistant District Attorney] . . . many months later . . . ."[14] The Assistant District Attorney conceded that the tape may have contained evidence and that the "NYPD messed up, Officer Giuca messed up. In all probability a lot of people messed up."[15] Ultimately, on September 12, 2012, Plaintiff was convicted of First Degree Assault. He was sentenced to 12 years' imprisonment.

### F. Defendants' Unconstitutional Practices and Policies

26. Plaintiff's factual allegations do not describe isolated or unusual incidents. The NYPD has developed and maintained a policy or custom permitting police officers to deny medical treatment to pretrial detainees, so as not to delay the booking process, including by, *inter alia*, threatening arrestees with additional time in custody prior to arraignment.

27. Plaintiff's investigation, which is continuing, has revealed numerous cases in which individuals charged with criminal offenses have been denied medical treatment for objectively serious medical conditions by employees of the City, including officers of the NYPD, commonly for the purpose of minimizing delays in the booking process. In some of these cases, detainees have died as a result of being denied treatment. These cases include:

   a. *Livingston v. City of New York*, 1:13-cv-05782 (E.D.N.Y.): Based on the complaint in this action, plaintiff was denied medical treatment for stomach pains, diarrhea, and convulsions while kept in a holding cell for approximately twenty hours, and died as a result. According to the complaint, plaintiff's condition was so dire that other inmates pleaded with officers to get her medical assistance. In response to the inmates' pleas, the officers told them to "[k]eep quiet or we'll lose

---

[14] Trial Tr. at 297, Sept. 11, 2012. Excerpts from the September 11, 2012 Criminal Trial transcript are attached as Exhibit 12.

[15] Trial Tr. at 291, Sept. 11, 2012. Excerpts from the September 11, 2012 Criminal Trial transcript are attached as Exhibit 12.

your paperwork." When an officer observed plaintiff convulsing on a bench, her response was to "[j]ust let it play out." Plaintiff died before emergency medical personnel could help her. This case is still ongoing in the United States District Court for the Eastern District of New York.

b. *Elianor v. City of New York*, 1:15-cv-01917 (E.D.N.Y.): According to the complaint in this action, plaintiff was denied epilepsy medication by NYPD officers after his arrest. After asking for his medication six times, plaintiff had a seizure and had to be hospitalized. Upon his return, plaintiff was denied medication again and had a second seizure. He woke up in the hospital with "scars" and a "whole bunch of cuts on his tongue" as a result of the officers' indifference. This case is still ongoing in the United States District Court for the Eastern District of New York.

c. *Wong v. Delgiorno*, 1:15-cv-02815 (E.D.N.Y.): According to the complaint in this action, plaintiff was attacked by a coworker in an elevator and subsequently arrested. Although plaintiff had serious injuries and suffered from Type II diabetes and high blood pressure, the officers at the First Precinct refused her medical attention. Plaintiff was allegedly kept in a jail cell for approximately nine hours with no food, water, or medication, and became symptomatic. During her detention, plaintiff's eye filled up with blood, and because of the delay in providing her with medical treatment, her vision deteriorated. This case is still ongoing in the United States District Court for the Eastern District of New York.

d. *Ayuso v. City of New York*, 1:12-cv-02132 (E.D.N.Y.): According to the complaint in this action, plaintiff, a diabetic with a failing kidney, was denied

11

insulin after her arrest, and began vomiting in her cell. The NYPD is alleged to have denied her medical attention deliberately, while mocking her condition. This case settled for an unspecified amount in 2013.

e. *Campbell v. Rodney*, 1:12-cv-02179 (E.D.N.Y.): According to the complaint in this action, plaintiff was denied the eye drops that had been prescribed for his glaucoma. When the officers finally gave him medication, they gave him medication to which he had a known allergy. Plaintiff filed a claim for deliberate indifference to medical needs. This case is still ongoing in the United States District Court for the Eastern District of New York.

f. *Castillo v. City of New York*, 1:10-cv-03507 (E.D.N.Y.): According to the complaint in this action, plaintiff, a diabetic, brought suit after officers denied him insulin for thirty hours following his arrest. As a result of the officers' inaction, plaintiff began vomiting, lost consciousness, and ended up in the hospital for two days. Plaintiff received a $150,000 settlement from the City.

28. On information and belief, these cases illustrate a widespread policy or practice—on the part the NYPD—of denying medical treatment to pretrial detainees so as to avoid delays in the booking process. As *The New York Times* has recognized, "reducing the arrest-to-arraignment time" is a "vexing problem" with which "court officials in New York City have struggled" for some time.[16] In this struggle, the health and safety of pretrial detainees have been the first casualties.

---

[16] James C. McKinley Jr., *New York Courts Cut Time Between Arrest and Arraignment*, N.Y. Times, Mar. 19, 2014, *available at* http://www.nytimes.com/2014/03/20/nyregion/new-york-courts-meet-elusive-goal-from-arrest-to-arraignment-in-under-24-hours.html?_r=0/

12

29. On information and belief, the NYPD and/or the City has a policy of prohibiting or limiting the right of a second-filing witness to initiate a criminal complaint in cases where another complaining witness has already done so. On information and belief, this "first-come, first-served" policy is applied to complainants who are similarly situated, without regard to the merits of their respective complaints. The NYPD has a longstanding practice of limiting the number of complaints that officers will accept, a practice that was most recently recognized—and criticized—by the newly established Office of the Inspector General for the NYPD. In its First Annual Report, the Office of the Inspector General noted that of the 150 complaints that it received in 2014, a number related to "[a]llegations regarding police officers not taking complaint reports."[17]

### G. Plaintiff's Injuries

30. As a direct and proximate result of the acts of Defendants, Plaintiff suffered the following injuries and damages:

    a. Violation of his constitutional rights under the Fourteenth Amendment to the United Sates Constitution to be free from mistreatment, including serious threats to his health and safety, while in state custody;

    b. Violation of his constitutional rights under the Fourteenth Amendment to the United Sates Constitution to equal protection of the laws;

    c. Denial of treatment for a serious medical condition;

    d. Lost employment and wages;

    e. Loss of friendship and companionship; and

    f. Past and future physical and psychological pain, suffering and emotional distress.

---

[17] NYC Dep't of Investigation, Office of the Inspector Gen. for the NYPD, *First Annual Report* 22 (2015), *available at* http://www.nyc.gov/html/oignypd/assets/downloads/pdf/annual_report_3-27-15.pdf.

31. The actions of Defendants violated the following clearly established and well-settled federal constitutional rights of Plaintiff:

   a. Due process of law based on Defendants' deliberate indifference to Plaintiff's serious medical condition. Under the Fourteenth Amendment, Plaintiff had a right not to be mistreated while in pretrial custody.

   b. Equal protection of the laws based on Defendants intentionally treating Plaintiff differently from another similarly situated person—Jones. Jones, as the first complainant, was allowed to make a complaint against Plaintiff, whereas Plaintiff, as the second complainant, was not permitted to make a complaint against Jones. At the time, Plaintiff and Jones were merely two participants in an altercation, both of whom had sustained injuries. Neither Plaintiff nor Jones had been convicted of an offense relating to the altercation, or even arraigned on charges pertaining to such an offense. Plaintiff and Jones were treated differently solely on the basis that Jones complained first. Indeed, based on Captain Taylor's review of the video surveillance from the incident, there was evidence that Plaintiff acted in self-defense, making his need to file a cross-complaint, if anything, more compelling than Jones's.

32. At all relevant times, Defendant Giuca was acting under color of law and under color of authority as a police officer, employee, and agent or servant of the City of New York.

33. Defendants' acts were intentional, malicious, reckless, wanton and/or cruel and demonstrated a callous indifference to Plaintiff's federally protected rights.

14

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AND DEPRIVATION OF RIGHTS UNDER THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
(against all Defendants)

34. Plaintiff incorporates by reference each preceding allegation as if fully set forth herein.

35. As a result of the injury that he sustained on April 25, 2011, Plaintiff developed an objectively serious medical condition—a fracture to his rib and injury to his left arm. As a result of his injuries, he experienced chronic and substantial pain, for which he was ultimately prescribed narcotic pain medication. His pain continued for a year after his initial treatment.

36. At the time of his arrest, Plaintiff repeatedly brought his condition to the attention of Defendant Giuca and other NYPD officers, including Captain Taylor and Detective King, and repeatedly requested medical treatment. At all relevant times, Defendant Giuca, Captain Taylor, and Detective King knew of Plaintiff's objectively serious medical condition, and deliberately and recklessly disregarded Plaintiff's substantial risk of serious harm. They denied the medical treatment that Plaintiff repeatedly requested. As a result, Plaintiff's medical treatment was delayed for a period of five days following his arrest, causing Plaintiff to suffer chronic and substantial pain.

37. The above-described practices, policies, and/or customs demonstrate deliberate, reckless, and callous indifference by Defendant Giuca and the City of New York towards the federally-protected rights of individuals in general, and Plaintiff in particular. At all relevant times, Defendant Giuca was acting under color of state law. Defendants' actions were the proximate cause of Plaintiff's injuries and deprivation of constitutional rights. Plaintiff claims

damages and other applicable relief under 42 U.S.C. § 1983 for the injuries set forth above for violation of his constitutional rights under color of law.

## SECOND CLAIM FOR RELIEF

## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983
(against Defendant The City of New York)

38. Before April 25, 2011, and on a continuing basis, the NYPD has engaged in a widespread, unconstitutional practice of denying medical treatment to pretrial detainees so as to minimize delays in the booking and processing of those detainees.

39. At all relevant times, the City of New York has been aware of this pattern of misconduct and has acquiesced in or tacitly authorized unlawful actions committed by its subordinates, including officers of the NYPD.

40. Before April 25, 2011, the NYPD developed and maintained a policy or custom permitting police officers to deny medical treatment to pretrial detainees so as not to delay the booking process by, *inter alia*, threatening arrestees who request medical treatment with additional time in custody prior to arraignment.

41. As a result of the above-described policies and customs, police officers of the City, including Defendant Giuca, believed that their misconduct, including the misconduct described herein, would not be investigated or sanctioned, but would be tolerated.

42. The above-described polices and customs demonstrate a deliberate, reckless, and callous indifference on the part of the City of New York to the constitutional rights of persons within the City of New York, and were the proximate cause of the violations of Plaintiff's rights alleged herein.

16

## THIRD CLAIM FOR RELIEF

### VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
(against all Defendants)

43. Plaintiff incorporates by reference each preceding allegation as if fully set forth herein.

44. Beginning on April 25, 2011, Plaintiff repeatedly sought permission to file a complaint against Rodwell Jones, who had assaulted him. These requests were denied by Defendant Giuca on the bases that the NYPD had already received a complaint from Jones, and that Plaintiff would require the District Attorney's permission if he wished to file a complaint of his own. When Plaintiff sought permission from ADA Snyder to file a complaint, he received no response. Accordingly, as the second complainant, Plaintiff was denied the opportunity to make an assault complaint against Jones, but Jones was permitted to file an assault complaint against Plaintiff—solely because he was the first complainant.

45. At all relevant times, Jones was similarly situated to Plaintiff. Both Jones and Plaintiff were involved in an altercation, which Jones initiated, and both sustained injuries during that altercation. Nonetheless, Plaintiff was intentionally and arbitrarily treated differently from Jones, on the basis of a policy or widespread practice favoring an initial complainant over a later one without giving primary regard to the particular facts involved in this case. There was no rational basis for this difference in treatment, and this policy is not rationally related to a legitimate state interest.

## JURY DEMAND

Plaintiff demands trial by jury as to all of his claims in this action, pursuant to the Seventh Amendment to the Constitution of the United States.

## PRAYER FOR RELIEF

46. WHEREFORE, Plaintiff prays that the Court will order the following relief jointly and severally against all Defendants:

   a. Enter judgment in favor of Plaintiff and against Defendants;

   b. Enter an order declaring Defendant Giuca's conduct unconstitutional;

   c. Award Plaintiff compensatory and punitive damages against Defendants;

   d. Enter a permanent injunction, upon proper motion, requiring Defendant City of New York to adopt appropriate policies related to the provision of appropriate medical treatment to persons awaiting trial;

   e. Enter a permanent injunction, upon proper motion, requiring Defendant City of New York to adopt appropriate policies related to the filing of criminal cross-complaints in circumstances of the kind set forth herein;

   f. Award Plaintiff reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

   g. Grant to Plaintiff such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief.

Dated: New York, New York
       July 29, 2015

By: _____

Freshfields Bruckhaus Deringer US LLP

Leah Friedman, Esq.
Scott Eisman, Esq.
Charline Yim, Esq.

601 Lexington Avenue, 31st Floor
New York, NY 10022
Tel: (212) 277-4000
Leah.Friedman@freshfields.com
Scott.Eisman@freshfields.com
Charline.Yim@freshfields.com

*Attorneys for Plaintiff James Hunter*