# EXHIBIT 2

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:   CRIMINAL TERM: Part 3
------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

            -against-                    Ind. No.

JAMES HUNTER,                            3430/2011

                        Defendant.       Hearing

------------------------------------------X

May 16th, 2012
Kings County Supreme Court
320 Jay Street
Brooklyn, New York  11201


B E F O R E:
            THE HONORABLE JAMES P. SULLIVAN,
            Justice, Supreme Court



A P P E A R A N C E S:

For the People:

        CHARLES J. HYNES
        District Attorney, Kings County
        By: JOSHUA LEE
        Assistant District Attorney


For the Defendant:

        JONATHAN FINK
        40 Exchange Place
        New York, New York



                            TANYA MILO
                            Senior Court Reporter
```

TMS

1              MR. FINK: There is a 911 tape which I would
2     request although I'm prepared to go forward with the
3     hearing. Also, Your Honor, if there is any paperwork
4     regarding the surrender of my client other than what's
5     in the Grand Jury synopsis sheet and the Complaint Room
6     Screening Sheet I request that as well. So the
7     Complaint Room Screening Sheet talks about how my
8     client was called by a captain and after a conversation
9     my client turned himself in but I don't have any
10    documentation other than what's in the Complaint Room
11    Screening Sheet and the Grand Jury synopsis sheet that
12    actually details the nature of these phone calls and my
13    client surrendering himself which I would argue
14    certainly is relevant for the Dunaway aspect of this
15    hearing. So it may be that there are no documents but
16    if there are certainly I would ask for them.
17             THE COURT: People, you have any response?
18             MR. LEE: I had asked the officer moments ago
19    whether or not any DD-Fives were generated in this
20    case. He does belong to the squad. He indicated to me
21    that he did not believe that he generated any DD-Fives
22    and to the best of my knowledge, Judge, there are no
23    other materials out there that memorializes the
24    surrendering of the defendant.
25             THE COURT: All right so the issue has been

1  raised and People indicate if I understood it and they
2  checked into it and they don't believe there is any
3  items they haven't turned over.
4      MR. LEE:  That's not what we're saying,
5  Judge.  There was a surveillance video of the
6  location --
7      THE COURT:  I spoke too broadly in terms of
8  specifically what Mr. Fink is asking about regarding
9  paperwork --
10     MR. LEE:  Not that I am aware of.
11     THE COURT:  -- for the surrender.
12     MR. FINK:  Your Honor, I don't mean to
13 interrupt.  There is a surveillance video.
14     MR. LEE:  Apparently --
15     THE COURT:  Well sometimes in a colloquy
16 things come out so yes that wasn't talked about.  So
17 now we'll hear about that.  There is a surveillance
18 video.
19     MR. LEE:  Apparently there is a nursing home
20 where this incident occurred.  The police officer had
21 asked the director of the nursing home if there was a
22 surveillance video that existed.  Copy of that
23 surveillance video was allegedly turned over to the
24 police officer.  The police officer indicated to me
25 that he could not open it, could not view it and I

TMS



```
 1   asked for that copy.  He handed it to me.  I tried
 2   opening it.  There is nothing on that CD that was
 3   turned over to me so as best -- as far as I know, you
 4   know, there is no recording out there and that's what I
 5   wanted to put on the record.
 6           THE COURT:  Well, so, again if I heard
 7   correctly the People have been informed that a machine
 8   was in place on the day in question that is as far as
 9   the People know it was capable of recording and they
10   inquired into it and they got some sort of media but
11   they tried to open or read the media and it was
12   negative.  Defense.
13           MR. FINK:  My question would be -- this is
14   the first time I'm hearing from the People about a
15   surveillance tape.  My question is when was this
16   provided to the People?  When did the officer get this
17   tape and were any efforts made to go back to the
18   nursing home and try to, in fact, get something that
19   would be viewable?  I'm just wondering.
20           THE COURT:  Defense is asking that question.
21   People can you respond?
22           MR. LEE:  Judge as far as I know I don't
23   believe there was another attempt to go back there.
24           THE COURT:  When did the People first learn
25   about the surveillance video?
```

1    MR. LEE: I believe it was two months ago
2  when I spoke with the victim's sister who indicated to
3  me that she told the police officers in this case that
4  there was a nursing home with a camera at that
5  location. That's the first time I heard about the
6  surveillance video. I asked the police officer could
7  you please provide me with the surveillance video. He
8  indicated to me there is nothing on that video, that
9  CD; they could not open it. I asked him to provide me
10 with a copy of it and I tried opening it and there is
11 nothing on it. There's no data on the CD. It appears
12 to be blank. I'm unable to open it and --
13    THE COURT: Let's approach.
14    (Whereupon a bench conference was held.)
15    We've had a brief discussion and the net
16 result is that we're going to proceed with the hearing.
17 If there is a question regarding the tape we'll
18 consider any objections that might come regarding that.
19    Is there anything else in terms of
20 preliminary?
21    MR. FINK: I don't think so. May I have a
22 moment with my client to explain what the bench
23 conference was?
24    THE COURT: Go ahead.
25    (Brief pause.)

TMS

1    A    Yeah it's pretty normal.  He's a police officer.
2    He's in uniform, he's out there doing his job.
3    Q    Do you know who he -- so after the conversation
4    ends what is Captain Taylor say to you?
5    A    He said listen I have JC coming back to East 22nd
6    and Ditmas Avenue.
7    Q    So it was your understanding after Captain Taylor
8    had hung up the phone that Mr. Hunter was going to go back
9    to the location that the captain was telling him to go to,
10   correct?
11   A    We knew JC was going to East 22nd and Ditmas
12   Avenue.
13   Q    Do you recall if there was any surveillance tape
14   that had been viewed at that particular time regarding this
15   incident?
16   A    No, sir do I know if there was a surveilling tape
17   viewed on my half.
18   Q    Or Captain Taylor's behalf?
19   A    He didn't say if he viewed a videotape but I
20   didn't.
21   Q    Do you recall hearing Captain Taylor tell
22   Mr. Hunter that he had seen a surveillance tape and that
23   that surveillance tape would ultimately exonerate
24   Mr. Hunter?
25   A    I was aware there was a video at the location

                                                        TMS

1   coming from an old age home on the corner of Ditmas Avenue
2   and I believe I was advised by -- well I made the
3   observation myself when I went back to the scene but I went
4   to speak to the director who provided me with a copy but
5   unfortunately the software in the police department doesn't
6   allow you to open this copy for various reasons and I wasn't
7   able to view what was on the video.
8       Q   So is there something -- let me ask you this when
9   did you get this video?
10      A   Approximately about a week after the incident.
11          MR. LEE:  And when did you inform the D.A.'s
12      Office about this videotape?
13      A   When I went to the Grand Jury I advised the ADA at
14  Grand Jury that I was working on getting video from the
15  location and the video still wasn't ready.  Like I said it
16  was about a week later and Grand Jury is about three days or
17  so, so when I had met ADA Lee I was able to give him the
18  video at the time.
19      Q   You're talking about the Grand Jury for this case,
20  you're talking about over a year ago, right?
21      A   Yes.
22      Q   This case went into the Grand Jury right around
23  the time of my client's arrest April 25th, 26th of 2011
24  correct?
25      A   Repeat the question.

TMS

```
 1        Q    My client was arrested on -- around -- on the date
 2   this incident occurred?
 3        A    Yes.
 4        Q    April 25th, 2011?
 5        A    Yes.
 6        Q    The case -- next few days it was presented to a
 7   Grand Jury right?
 8        A    Yes.
 9        Q    Within the next week it went into the Grand Jury,
10   right?
11        A    Right.
12        Q    So you're aware at that time of there being a
13   videotape, correct?
14        A    I was aware there was video in the vicinity;
15   whether or not it captured the incident I don't know.
16        Q    You were provided with, correct me if I'm wrong,
17   your testimony you were actually given a videotape about a
18   week after my client's arrest?
19        A    Right.
20        Q    And your testimony is that you mentioned this to
21   the assistant who was presenting this case to the Grand
22   Jury?
23        A    I believe I told him this was video but I don't
24   have a video, not video of the incident, video of the area
25   but I don't know if it captured the incident.
```

```
 1    Q    You don't know if what that videotaped?
 2    A    I don't know.
 3    Q    When did you try to open it?
 4    A    When I met with the -- I'm not sure if it was
 5  Mr. Lee or another D.A.
 6    Q    I'm trying to get a timeframe in relation to my
 7  client's arrest.
 8              MR. LEE:  Judge, I think this is outside the
 9        scope at this point.  It's clear there is no video.
10        Can we just move on?
11              MR. FINK:  I don't know --
12              THE COURT:  I will allow the question.  He
13        can answer it if he knows.  Repeat the question.
14              THE WITNESS:  Please.
15              MR. FINK:  Can we have it read back?
16              (Whereupon the last question was read back by
17        the court reporter.)
18              THE COURT:  The video versus when he was
19        arrested, do you recall?
20              THE WITNESS:  I don't recall the timeframe
21        when I met not with the Grand Jury D.A. but the next
22        D.A. putting the case together.  I believe this case
23        changed hands a couple of times.
24    Q    When did you first inform Mr. Lee there might be
25  video regarding this particular case?
```

TMS

1   A   I couldn't tell you when I first met with him, I
2   don't know.
3   Q   And you provided the video to Mr. Lee?
4   A   Yes, sir.
5   Q   And you're not sure if, in fact, there is anything
6   on the video as you testified here today, is that correct?
7   A   No, sir.
8   Q   Did you ever go back to the nursing home to try to
9   get another copy of the video, of the surveillance?
10  A   Another copy?
11  Q   Yes.
12  A   Well the software they provided on the tape
13  doesn't -- we can't use in our computers. What's the sense
14  of getting another copy? So I never went back to get
15  another copy.
16  Q   Did you consider going there to see if you could
17  view it on their computer or software?
18  A   I don't think it was available because I wasn't
19  able to do that on the first day, the 25th, otherwise I
20  would have done that. Many times video gets lost and you're
21  unable to download it. I would have viewed it that day if I
22  was able to; that wasn't an option.
23  Q   You can go there now and try to view it?
24  A   Most video surveillance memories don't hold that
25  long, don't hold storage for that long.

1   Q   It's your understanding as you testified here
2   today you believe that if, in fact, there was video
3   depicting anything from April 25th, 2011 it would be erased
4   at that point, is that your testimony?
5   A   Could be the case, yes.
6   Q   What's the name if you know of the -- do you know
7   the name of the home or nursing home or old age home that
8   you were --
9   A   I can tell you where it's located. I don't know
10  the name.
11  Q   Can you tell me the address?
12          THE COURT: It's on the corner.
13          THE WITNESS: Corner of East 22nd and Ditmas.
14      Takes up the whole corner.
15          THE COURT: Whole corner.
16          THE WITNESS: Twenty first and 22nd and
17      Ditmas on the north side of the street.
18  Q   And just to go back to what I was asking you
19  initially about Captain Taylor you don't recall him saying
20  to my client or to anyone on that day that hey we have, you
21  know, surveillance tape and I've seen it and it shows that
22  you were justified in everything that happened? You don't
23  recall him saying that to my client?
24  A   He might have but the conversation I remember was
25  you need to come back to East 22nd and Ditmas so we can sort

                                                              TMS

```
 1  that out.  That's the conversation I remember.
 2      Q    Do you recall if he made any kind of promises to
 3  my client or anything that would influence him more likely
 4  to cooperate than not?  Does that -- is that clear what I'm
 5  asking you?
 6      A    I know what you're saying but I don't recall any
 7  promises or any -- anything other than the arrangement you
 8  have to come back, we have to settle this out.
 9      Q    As far as you know, Mr. Hunter was fully compliant
10  in doing just that, right?
11      A    Yes, sir.
12      Q    You didn't have to go hunting for him or looking
13  for him, right?
14      A    No, sir.
15      Q    When you went to Ditmas and East 22nd he was there
16  in a matter of seconds?
17      A    Yes.
18      Q    He was walking in your direction is that fair to
19  say?
20      A    Yes.
21      Q    And did he identify himself when you initially saw
22  him or -- withdrawn.
23           How did you know Mr. Hunter was Mr. Hunter when
24  you first saw him?
25      A    We didn't know who Mr. Hunter was.  We didn't know
```

TMS

1      A    Yes.

2      Q    Did he ever tell you while he was in your custody
3   that Mr. Jones had actually hit him with that pipe?

4      A    Yes.

5      Q    And do you recall when my client told you that?

6      A    I believe he told us at the scene and he also told
7   us back at the interview room after he was read Miranda he
8   made statements that he was struck with the pipe.

9      Q    Did he show you any injuries he had regarding
10  being hit with the pipe?

11     A    Yes he lifted up his shirt and told us he was
12  struck in the side underneath the armpit which point we
13  asked him to lift up his shirt.  We took pictures.  We
14  didn't see bruising.  He lifted his shirt and arm, he didn't
15  seem to have trouble doing so which gave me the indication
16  that there was no injury there.

17     Q    So you didn't think that he -- based upon your
18  observations you didn't believe that my client was hurt, is
19  that what you're saying?

20     A    Correct.

21     Q    Was there any -- was there a discussion about
22  having him get any kind of medical treatment?

23     A    We said do you want EMS to take a look at you, he
24  refused.

25     Q    I'm going to move ahead.  We can come back to

TMS

1  this.  Your testimony is that you didn't observe any
2  injuries to my client, is that correct?
3       A    Correct.
4       Q    But you said he lifted up his shirt, right?
5       A    Yes.
6       Q    That was based upon you asking him to lift up his
7  shirt or did he do that to show you something.
8       A    He told me he was struck with a pipe.  I said let
9  me see your injuries.  He pointed to the area and he said
10 look and he had nothing there.
11      Q    Did he indicate that he was in pain?
12      A    He said he was in pain.
13      Q    He did.  And after he -- at what point at the
14 precinct did he show you that he had been hurt?
15      A    Sometime during the interview.
16      Q    So when he's taken to the 70th Precinct where is
17 my client first brought?
18      A    They're always -- always first brought in front of
19 the desk, precinct desk.
20      Q    He's searched in front of the desk?
21      A    Correct.
22      Q    And was anything recovered from him when he was
23 searched at the desk?
24      A    I believe I have a cell phone, some keys and cell
25 phone charger.

TMS

1    understand from Mr. Lee there is nothing on the tape.
2            THE COURT: Here's my suggestion, based on
3    situations that have come up like this People you have
4    what was turned over to you, is that correct?
5            MR. LEE: Yes, Judge.
6            THE COURT: So they turn that over to you or
7    they make a dupe for you.
8            MR. FINK: Right.
9            THE COURT: You'll see. Maybe you could see
10   something they didn't see.
11           MR. FINK: Right.
12           THE COURT: That has happened.
13           MR. FINK: Yeah.
14           THE COURT: But if after you review yours
15   there is nothing on yours then you decide whether you
16   want to make any other inquiries.
17           MR. FINK: Right. Okay.
18           THE COURT: So the People turn that over.
19           MR. LEE: Absolutely, Judge.
20           THE COURT: Okay.
21           MR. FINK: That's it.
22           THE COURT: See you back on the first.
23                   *       *       *
24   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF MY
     STENOGRAPHIC NOTES.
25   _____
     TANYA MILO - Senior Court Reporter

TMS